**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. FaSHONNUS FOY, | ) ) ) | |
| Petitioner, | ) ) | No. 10 C 04549 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| GUY PIERCE, Warden, Pontiac Correctional Center, | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner FaShonnus Foy ("Foy" or "Petitioner") is incarcerated at the Pontiac

Correctional Center in Pontiac, Illinois. Following a jury trial in the Circuit Court of

Cook County, Illinois, Petitioner was convicted of first degree murder. Resp't Ex. A at 1

(Rule 23 Order, *People v. Foy*, No. 1-05-1471 (Ill.App. 2007)). The Circuit Court

sentenced petitioner to sixty years imprisonment. *Id.* Foy now petitions for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, claiming that the testimony of two

eyewitnesses to the shooting was unreliable and failed to provide a sufficient basis for the

jury to convict him. For the reasons set forth below, Foy's petition is denied.

## I.      BACKGROUND

### A.  Factual Background

Petitioner was tried for Jones' murder in February 2005. At trial, the state

presented (among other evidence) the testimony of two witnesses to the shooting, Brian

Braggs and Shamika Jackson. On the day of the shooting, Braggs was with the victim,

Jones, who went by the nickname "Relly-Rell," and a group of others including an

individual named Michael, who was known to the group as "Party Ho."  During the day, the group had been shooting dice and drinking beer near the intersection of Central Park Avenue and Iowa Street.  Braggs denied, however, being under the influence of alcohol or drugs at the time of the shooting.[1]  The Illinois Appellate Court summarized Bragg's testimony about the shooting as follows:

> Iowa Street is a one-way westbound street. Brian and the group shooting dice were on the north side of Iowa, while the victim was on the south side of Iowa, talking to a female. As they were shooting dice, Party Ho' said something. Brian turned around so that he was looking east down Iowa and saw "Boo" coming down the street. Brian had seen "Boo" before and identified him as the [Petitioner]. When Brian first observed the [Petitioner], he was walking in the middle of the street toward Central Park. From about three car lengths away, Brian saw the [Petitioner] pull a gun from his belt. [Petitioner] fired in the direction of Party Ho' and the victim, who were about 10 feet apart on opposite sides of Iowa Street. Brian heard two gunshots and began running north through an alley that bisected Iowa Street toward Augusta Avenue. He tripped on a stump. As he got up and looked back, he saw the [Petitioner] go towards Party Ho' and the victim; the [Petitioner] had a pistol in his hands. [Petitioner] began running toward Central Park Avenue. Brian heard two or three more gunshots, and he continued to run north to Augusta Avenue. After he reached Augusta Avenue, Brian turned south to return to where the victim was. Once he reached Central Park Avenue, he saw the victim across the street on the sidewalk in a pool of blood. Afterwards, Brian got a ride with a friend and bought some beer. He did not stay at the scene and wait for the police because at the time he was scared.

---

[1] The facts set forth herein are taken from the Illinois Appellate Court's decision of Petitioner's direct appeal.  Findings of fact made by state courts are presumed to be correct and may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007).  Petitioner failed to present clear and convincing evidence to rebut the presumption of correctness attaching to the state court's findings of fact; therefore, this Court presumes those findings are correct.

Resp't Ex. A at 2-3.

Shamika Jackson also testified about the shooting. The Appellate Court summarized her testimony as follows:

> On June 17, 2001, Shamika Jackson went to her aunt's residence at St. Louis Street and Iowa Street. Around 7 p.m., she went around the corner to Iowa Street to see if anyone wanted to go to Navy Pier with her. Michael, Ronnie, Jimmy, Brian and Corey were playing dice. Another man, also named Corey, was standing at or close to the corner of Iowa Street and Central Park Avenue. After asking if anyone wanted to go to Navy Pier, Ms. Jackson stood on the sidewalk in front of a building, about 15 to 20 steps from Central Park Avenue which was to her left. She was speaking to her mother on her cell phone when a man came out of an alley to her right and walked toward the dice game.
>
> Ms. Jackson's attention was drawn to the man when one of the dice players said "What's up, Boo?" The man then began shooting in the direction of Central Park Avenue and at Michael and Corey, also known as "Relly-Rell," who had been standing next to a car closer to the corner of Iowa Street and Central Park Avenue. The shooter was 6 to 7 feet in front of her; because there was a car between them, Ms. Jackson observed the shooter from his chest up. She heard six gunshots, all fired in the direction of Central Park Avenue.
>
> When the man stopped shooting, he turned toward Ms. Jackson, facing her, and went back through the alley. She observed his face from about a distance of 6 feet. About 15 to 20 seconds passed between the time her attention was focused on the shooter until she lost sight of him when he walked into the alley. She noticed that the shooter had a tattoo of a teardrop on his eye. She identified the [Petitioner] as the man she observed firing the shots.
>
> Ms. Jackson then walked to Central Park Avenue. When she reached the corner of Iowa Street and Central Park Avenue, she saw the victim, Ronnie and Michael on the other side of Central Park Avenue. A small, dark, four-door car pulled up in front of her on Central Park Avenue headed toward Augusta Avenue. The same man she saw shooting was in the car on the driver's side, which was

closest to where the victim and Michael were. Although she was on the passenger side, she was able to see the man because it was daylight. The man shot out of the driver's window at the victim and Michael. The car continued toward Augusta Avenue. She identified the [Petitioner] as the man in the car shooting at the victim and Michael. When she first saw the man, he had a black, automatic weapon. She did not see what kind of gun he had when he was shooting out of the car.

After hearing the gun shots, everyone began to run but the victim, who fell. After the victim was removed, Ms. Jackson left the scene. She did not talk to the police that night because she did not want to get involved. She did not use her cell phone to call police, and she did not tell her mother about the shots being fired. Ms. Jackson did not run when the first shots were fired because she did not want the shooter to think she was running from him. The victim and the men playing dice were not exactly friends of hers; she knew them from the neighborhood.

*Id.* at 4-6.

The Appellate Court also reviewed the police investigation of the shooting, summarizing the involvement of Braggs and Jackson as follows:

Brian did not contact the police after the victim was shot. On June 28, 2001, the police came to his residence and brought him to the police station. There he viewed a photo array of five pictures and selected the [Petitioner]'s picture. At that time, Brian did not give the police a description of the [Petitioner] or the clothes he was wearing.

Brian was not sure how many women there were in the area of the shooting; the only woman he saw was the one talking to the victim. He denied knowing a woman named Shamika Jackson.

\*\*\*

After the police interviewed Brian Braggs, the investigation focused on the [Petitioner]. On October 16, 2001, following a police chase, the [Petitioner] was arrested. At the time of his arrest, the [Petitioner] was 5'10" tall and weighed 165 pounds. His hair was cut very short. He had two tattoos on

his face, a teardrop and a star. The "star" was larger than the teardrop. [Petitioner] also had tattoos on his forearms[.]

In September 2003, Ms. Jackson was interviewed by police at her residence. She described the shooter as 5'11", 175 pounds and medium-skinned. He had a short haircut or a "fade" meaning that he had a small amount of hair on the top with less on the sides. She also described the shooter as having a teardrop tattoo on either his face or his eye. She described to the police what she had observed the night of the shooting. She was subsequently subpoenaed to testify at the [Petitioner]'s trial.

*Id.* at 3, 6-7.

Jackson also identified Petitioner in a lineup on December 4, 2003, more than two years after Jones was murdered. *Id.* at 11. Petitioner successfully moved to have testimony of this pretrial identification suppressed because he was denied his right to have counsel present during the lineup. Resp't Ex. S at VV-34 (Trial Report of Proceedings, Vol.2 of 7, *People v. Foy,* No. 01 CR 27698 (Cir. Ct. Cook Cty.); Resp't Ex. A at 11. In an independent-basis hearing conducted before trial, however, the trial court concluded that Jackson could still testify as to her observations during the commission of the crime. Resp't Ex. S at VV-32, VV-34. The trial court found, after reviewing the relevant factors, that Jackson's identification testimony was sufficiently reliable to be admitted. *Id.* at VV-32-34.

**B. Procedural Background**

On February 17, 2005, a jury in the Circuit Court of Cook County, Illinois, found Foy guilty of first degree murder. *See* Resp't Ex. A. Foy directly appealed his conviction and sentence to the Illinois Appellate Court, raising three issues:

[A] whether the identification testimony was sufficient to sustain his conviction; [B] whether the trial court erred in finding there was an independent basis for a witness's identification of the defendant; and [C]

whether the defendant's rights to confrontation and effective assistance of counsel were violated by the admission of hearsay testimony.

*Id.* at 1. The state appellate court affirmed on December 18, 2007, in an unpublished opinion. *Id.*

Petitioner, through counsel, filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court. The PLA, however, raised only the issue of whether the identification testimony was sufficient to sustain his conviction. Resp't Ex. F at 5 (Direct Appeal PLA, *People v. Foy,* No. 106171 (Ill.)). The Illinois Supreme Court denied the PLA on May 29, 2008. *People v. Foy*, 889 N.E.2d 1118 (Ill. 2008) (Table).

Foy now petitions this Court for a writ of habeas corpus, raising the same claims brought on direct appeal in state court. Pet'r's. Br. at 5-6.

## II. ANALYSIS

### A. Claim A: Sufficiency of the Evidence

Petitioner's habeas petition challenges the sufficiency and reliability of the identification testimony of Shamika Jackson and Brian Braggs to sustain his guilt beyond a reasonable doubt. Foy's petition is governed by 28 U.S.C. § 2254, subject to the amendments of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, determinations of the state court of last review are "entitled to considerable deference." *Coleman v. Johnson*, -- U.S. --, --, 132 S. Ct. 2060, 2065 (2012); 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), a petition for a writ of habeas corpus may only be granted if the state court's determination was: "(1)…contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A state court's decision is "contrary to" federal law only if it applies a rule that contradicts the law as set forth by the Supreme Court or if the "state court confronts facts materially indistinguishable from a relevant Supreme Court precedent and arrives at [a contrary] result." *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, a "state court decision is unreasonable for purposes of Section 2254(d)(1) [only] if its application of Supreme Court precedent 'l[ies] well outside the boundaries of permissible differences of opinion,'" *McFowler v. Jaimet,* 349 F.3d 436, 447 (7th Cir. 2003) (citing *Williams,* 529 U.S. at 411). The Supreme Court has explained that:

> Under § 2254(d)'s "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [federal law] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [the federal law] to the facts of his case in an objectively unreasonable manner. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law."

*Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (emphasis in original) (internal citations omitted).

Although Petitioner occasionally argues throughout his reply that the Illinois Appellate Court's decision to affirm the jury's verdict was "contrary to" established federal law,[2] those contentions are premised on his view that the Appellate Court's assessment of his arguments was not supported by its application of the controlling

---

[2] In assessing Petitioner's claim, "the relevant decision…is the decision of the last state court to rule on the merits of the petitioner's claim." *McFowler*, 349 F.3d at 446. Here, that decision is the order of the Illinois Appellate Court.

precedents he cites.  As such, the essence of the petition is the contention that the

Appellate Court applied the relevant law in an objectively unreasonable manner.

The relevant standard that the appellate court was required to apply when

assessing the sufficiency of the evidence to support a conviction is whether, after viewing

all the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979).[3]  But the standard that governs this Court's review

of the Appellate Court's determination is even more demanding.  Sufficiency claims face

a high bar in federal habeas proceedings "because they are subject to two layers of

judicial deference." *Johnson*, -- U.S. --, --, 132 S.Ct. at 2062.  This is so, because:

> First, on direct appeal, "it is the responsibility of the jury–not the court–to
> decide what conclusions should be drawn from evidence admitted at
> trial…And second, on habeas review, "a federal court may not overturn a
> state court decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state court.  The
> federal court instead may do so only if the state court decision was
> 'objectively unreasonable.'"

*Id.* (citing *Cavazos v. Smith,* 565 U.S. 1, --, 132 S.Ct. 2, 4 (2011) (*per curiam*)).

Thus, to prevail on his sufficiency challenge, Petitioner must demonstrate not

only that the Illinois Appellate Court's determination—that the jury reasonably could

have concluded, based on the challenged evidence, that Petitioner shot Jones—was

flawed, but also that it was objectively unreasonable; that is to say, that no reasonable

court could have concluded that a jury reasonably could have reached that conclusion

---

[3] Although the Appellate Court did not explicitly cite *Jackson*, it clearly applied the
correct legal standard.  Resp't Ex. A at 18.  Petitioner concedes that the fact that the
Appellate Court did not cite *Jackson* is of no import. Pet'r's Reply at 9 ("petitioner agrees
with respondent's implicit argument that it is not necessary for a state court to cite
governing Supreme Court cases as recognition of the correct standard").

beyond a reasonable doubt.  *See McFowler,* 349 F.3d at 456.  Petitioner's challenge to the Appellate Court's determination falls well short of satisfying this demanding standard.

The gist of Petitioner's challenge to the sufficiency of the identification testimony is not to the quantum of evidence presented—the testimony of just one identification witness can be sufficient to sustain a conviction, *Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005), and here there are two—but to its quality.  Petitioner claims that the identification testimony was unreliable, but there is ample basis in the record to support the Appellate Court's determination that the testimony of both witnesses was reliable.

*1.  Jackson's Testimony*

The Appellate Court determined that Jackson's testimony was reliable after applying the correct federal standard as defined by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972).  Pursuant to *Biggers*, the reliability of identification testimony must be determined under the "totality of the circumstances," with an emphasis on five factors. 409 U.S. at 199; *see also McFowler*, 349 F.3d at 449.  These five factors are:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Biggers,* 409 U.S. at 199-200.

The record indicates that on June 17, 2001, the date of the incident, Jackson had the opportunity to view the shooter from six to seven feet away, from the chest up. Resp't Ex. A at 5.  When the shooter stopped firing, Jackson viewed his face from a distance of about six feet, noticing that he had a teardrop tattoo on his eye. *Id.*  Jackson then viewed the shooter a second time, when he pulled in front of her in a small vehicle and continued

shooting at the victim out of the driver's window. *Id.* In September 2003, Jackson

provided a description of the shooter to the police.[4] *Id.* at 7, 12. Jackson described the

shooter as "5'11", 175 pounds and medium-skinned. He had a short haircut…[and] a

teardrop tattoo on either his face or his eye." *Id.* at 7. When taken into custody in 2001,

the Petitioner was "5'10" tall and weighed 165 pounds. His hair was cut very short

…[and he] had a teardrop tattoo on his face." *Id.* at 12.

Applying the first, second and third *Biggers* factors, the Appellate Court found

that: (1) once Jackson's attention was "drawn to the shooter, she observed him for 15 to

20 seconds," saw his face in daylight and "viewed the shooter a second time when he

fired from the vehicle"; (2) Jackson's "degree of attention to the shooter was reflected in

the description she gave to the police of the shooter's height, weight, complexion and

hairstyle, as well as the teardrop tattoo on his face"; and (3) "the physical description

Jackson gave to police in 2003 was similar to the description of the defendant when he

was taken into custody in 2001." *Id.* at 11-12. Each of these factors strongly supports the

Appellate Court's assessment that Jackson's identification of the Petitioner as the shooter

was sufficiently reliable to support the jury's verdict.

Petitioner challenges the accuracy of Jackson's prior description, pointing out that

Jackson failed to describe his additional tattoos, including those on his arms and a "star"

---

[4] Petitioner contends that Jackson testified that she "did not see petitioner fire a gun nor holding a gun," Pet'r's Reply at 13, but the record belies that claim. Jackson indeed testified that she witnessed Petitioner holding and firing a gun. Resp't Ex. U at YY-108-09 (Trial Report of Proceedings, Vol. 4 of 7, *People v. Foy,* No. 1 CR 27698 (Cir. Ct. Cook Cty.) (Jackson testifying that she saw Petitioner with a gun in his hand and firing in the direction of Central Park)); *Id.* at YY-116 (Jackson testifying that she saw Petitioner shooting from the driver's side of a vehicle). What Jackson could not see was the *type* of gun held by Petitioner when he fired at the victim a second time from a vehicle. *Id.* at 117-18.

on his face. *Id* at 12. That Jackson failed to mention all of Petitioner's tattoos, however, does not render her identification unreliable as a matter of law. *See, e.g., United States v. Traeger,* 289 F.3d 461, 474 (7th Cir. 2002) ("in the face of the other factors indicating that [the eyewitness's] identification was reliable, her failure to notice whether the robber had tattooed hands is insignificant"). Jackson's accurate description of a distinctive tattoo and its location on Petitioner's body is far more probative than her failure to take note of other markings.

Petitioner maintains, however, that Jackson did not testify that the shooter "definitely" had a teardrop tattoo, but only "'possibly' had such a tattoo." Pet'r's Reply at 13-14. And while Petitioner is correct that Jackson testified (in the independent-basis hearing before trial) that when she originally described the shooter to the police, she said that the shooter "possibly" had a teardrop tattoo on his face, Resp't Ex. S at UU-20, that fact does not help Petitioner's cause. Jackson's slight equivocation, which was only about the shape of the tattoo, not its existence or location, hardly renders her subsequent identification of Petitioner at trial unreliable given the fact that Petitioner does, indeed, have a teardrop tattoo on his face. Resp't Ex. A at 12. Jackson's lack of certainty about the shape of the tattoo might be more consequential if it had proven to be inaccurate— *i.e.,* if Petitioner's tattoo were ***not*** a teardrop, but something quite dissimilar—but the Appellate Court was well within the boundaries of reasonableness in concluding that Jackson's prior description was accurate (and, therefore, that her testimony at trial was therefore sufficiently reliable).[5]

---

[5] It is significant that Jackson's description to the police occurred before any lineup was ever conducted. Resp't Ex. S at 19, 21-22, (Jackson provided description of Petitioner to police on September 16, 2003 and participated in the lineup on December 4, 2003). The

As for the fourth *Biggers* factor, the witness's level of certainty, Petitioner argues that the Appellate Court erred when it did not consider evidence relating to the pretrial lineup conducted on December 4, 2003, Resp't Ex. S at 4-TT, in which Petitioner claims that Jackson could not "immediately" identify the Petitioner as the shooter. Resp't Ex. A at 11. Because the lineup was suppressed[6] and therefore never considered by the jury, the Appellate Court determined it was "not relevant to [its] determination of whether the evidence heard by the jury was sufficient to convict the defendant beyond a reasonable doubt." *Id.*

While the Appellate Court's conclusion that evidence that Jackson had difficulty identifying Petitioner in an earlier lineup should not be considered in assessing the sufficiency of the evidence supporting the conviction—because that evidence was not presented—is indisputably correct, that conclusion does not address explicitly the substance of Petitioner's claim, namely, that Jackson's alleged difficulty during the lineup **should have** been a factor in the jury's deliberation.  In essence, Petitioner's argument is not that the jury inappropriately evaluated the evidence it heard, but that it was not presented with additional evidence that would have undermined the reliability of the evidence that was presented.

If (as the Court assumes for purposes of this petition) Jackson had difficulty identifying Petitioner in a lineup conducted two years earlier,[7] evidence of that fact—if

_____

description plainly was the product of Jackson's memory, and was not influenced by any subsequent viewing of the Petitioner after the shootings occurred.

[6] On Foy's motion, the trial court suppressed the lineup evidence because Foy was denied his right to counsel during the lineup in violation of his rights under the Sixth Amendment. Resp't Ex. A at 11.

[7] This Court makes no determination as to whether or not Jackson was able to immediately identify Petitioner in the lineup.  For purposes of this decision, it is assumed

presented at trial—might have influenced a jury to discount the value of Jackson's in-court identification.  Then again, since Jackson ultimately identified the Petitioner on both occasions, evidence of the lineup identification may have only cemented Petitioner's fate.  The petition provides no basis on which we can say with any degree of confidence that the lineup evidence would have had one effect or the other.  The evidence cited presents a mixed bag that does not clearly undermine the reliability of the eyewitness testimony, so it was anything but "objectively unreasonable" for the Appellate Court not to consider it in evaluating the reliability of the testimony that Jackson provided.  See, for example, *McFowler*, 349 F.3d at 454-55, where the Seventh Circuit concluded that it was not objectively unreasonable for the state appellate court to conclude that in-court identification testimony was reliable notwithstanding the presentation at trial of testimony that made it "impossible" to determine whether the witness had identified the defendant in a prior lineup.[8]

---

that, as Petitioner maintains, Jackson identified him in the lineup only after some hesitancy.  Pet'r's Reply at 9.

[8] In *McFowler*. the evidence presented at trial of a prior lineup identification was described by the Seventh Circuit as "puzzling," "self-contradictory," "hopelessly inconsistent," and "nonsensical."  349 F.3d at 450-51, 455.  Nevertheless, the Seventh Circuit held that it was not objectively unreasonable for the state appellate court to conclude that a reasonable fact-finder could have found the in-court identification sufficiently reliable notwithstanding that it was "impossible" to determine whether the witness had identified the defendant in the prior out-of-court lineup.  Here, by contrast, the petition provides no basis to question that Jackson correctly identified Petitioner in the lineup (and Petitioner does not assert that she did; rather, he argues only that she did not identify him "immediately").  Nor does it provide a basis to assert that the lineup was unduly suggestive, thereby tainting the subsequent in-court identification.  Indeed, the record reflects only that the lineup was suppressed because it was conducted before an attorney representing the Petitioner was present.  Resp't Ex. A at 11.  The lineup evidence described in the petition falls far short of the evidence that was presented in *McFowler*, and yet even there, the evidence of the unreliable lineup identification did not render the Appellate Court's judgment affirming the verdict "objective unreasonable."

The uncertain import of the lineup evidence also highlights another dispositive defect in Petitioner's argument. The jury did not hear any evidence about the prior lineup because the Petitioner (and/or his counsel) chose not to present it. Rather than affirmatively using Jackson's purported difficulty in identifying him as the shooter in the prior lineup, Petitioner's counsel capitalized on the fact that the police conducted the lineup without the presence of counsel representing Petitioner to successfully suppress the evidence of the prior identification. Petitioner (and/or his counsel) evidently believed that the evidence that Jackson had identified Petitioner as the shooter during the lineup would have been more damaging than the evidence that she had some difficulty in doing so would have been helpful. Having made that assessment, which falls well within the parameters of the tactical judgments entrusted to trial counsel,[9] Petitioner cannot now change course and argue that the evidence of Jackson's purported difficulty in identifying him should have been available to, and considered by, the jury.[10] *See, e.g., Ross v. Heyne,*

_____

[9] To the extent that Petitioner argues that the lineup evidence was exculpatory, and therefore should have been heard by the jury, the claim is not as to the sufficiency of the evidence but the effectiveness of counsel. That issue—whether the defense counsel's decision to have the lineup suppressed constituted "sound trial strategy" or "deficient performance,"—would need to be analyzed under the standard articulated in *Strickland v. Washington,* 466 U.S. 668 (1984). *See Cosby v. Sigler,* 435 F.3d 702, 707 (7th Cir. 2006). However, an ineffective assistance of counsel claim is not properly before this Court and appears in any event to be a long shot in view of the substantial deference afforded to defense counsel in deciding whether or not to seek the suppression of evidence. *See, e.g., Id.* at 707(defense counsel's decision not to file a motion to suppress an inculpatory statement because the statement corroborated defendant's mistake-of-fact defense was "sound trial strategy"); *Killingsworth v. Bensko,* 386 F.Supp.2d 949, 960 (N.D.Ill. 2005) ("the decision whether to file a motion to suppress or not is usually a strategic call that will be given substantial deference against second-guessing"); *People v. Snowden,* 956 N.E.2d 923, 937 (Ill. 2011) ("The question of whether to file a motion to suppress evidence is traditionally considered a matter of trial strategy").

[10] Even after suppression, Petitioner had the option of introducing the lineup evidence to impeach Jackson's credibility as an eyewitness. This, of course, would have opened the door for the State to rehabilitate Jackson's credibility by drawing out the details of her

638 F.2d 979, 986 (7th Cir. 1980) (citing *Evans v. United States,* 408 F.2d 369, 370 (7th Cir. 1969) (explaining that a criminal defendant cannot "withhold…evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent" habeas proceeding)).

As to the final *Biggers* factor, Petitioner asserts that the Appellate Court's determination was unreasonable because "more than two years passed between the time of the crime and when Ms. Jackson gave police a description of the shooter and viewed him in the lineup." Resp't Ex. A at 11-12.[11] In *Biggers*, the Supreme Court explained that a time lapse of seven months "would be a seriously negative factor in most cases." 409 U.S. at 201. That said, after weighing *all* of the factors, the *Biggers* court concluded that the testimony was reliable despite the delay. *Id.* Moreover, other courts have found identification testimony reliable even where a time lapse of greater than seven months has occurred. *See, e.g.*, *McFowler,* 349 F.3d at 450 (29-month delay); *Mills v. Carson*, 572 F.3d 246, 252 (6th Cir. 2009) (9-month delay). Similarly, the Appellate Court reviewing Foy's direct appeal considered the time lapse between the crime and challenged identification, but found it outweighed by Jackson's opportunity to view the shooter, the close physical description of the Petitioner she provided to the police, and the corroborating testimony of Braggs. Resp't Ex. A at 12-13. This determination is

---

performance in the lineup (the most notable detail being Jackson's positive identification of Petitioner). *See People v. Lynn,* 904 N.E.2d 987, 994 (Ill. App. Ct. 2009) ("There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible"); *see also People v. Payne,* 456 N.E.2d 44, 46 (Ill. 1983) (defendant invited or "opened the door" to admission of suppressed evidence).

[11] Petitioner does not contend that the almost four-year period between the crime and the trial is the appropriate period to consider, in view of the fact that Jackson provided an accurate description of Petitioner two years before trial.

consistent with the Seventh Circuit's teaching that the dispositive issue is whether "the witness had a sufficient basis for identifying the defendant (*e.g.,* an adequate opportunity to observe the defendant at the time of the offense)," rather than the duration of time between the crime and the identification, or the absence of a pretrial identification. *McFowler,* 349 F.3d at 453.

Having reviewed the Illinois Appellate Court's assessment of all of the *Biggers* factors as they apply to Jackson's testimony, the Court concludes that the state court's assessment was not "objectively unreasonable." Indeed, the Appellate Court's assessment that the testimony of a witness who, before ever seeing the Petitioner again, accurately described from memory the Petitioner's height, weight, race, haircut, and distinctive tattoo was eminently reasonable.

### 2. Braggs' Testimony

Petitioner's challenge to the reliability of Braggs' testimony is even less substantial. To recap that testimony, at the time of the incident, Braggs was with a group of friends playing dice and drinking beer. Braggs, who testified that he knew Petitioner as "Boo," witnessed Petitioner: (1) walk down the street and pull a gun from his belt; (2) fire in the direction of the victim; and (3) approach the victim with a gun. Resp't Ex. A at 2-3. Braggs fled the crime scene during the shooting and did not provide the police with information immediately after the incident. However, he was able to identify the Petitioner in a photo array, but did not provide the police with a physical description of the shooter. *Id.* at 3.

Petitioner maintains that it was objectively unreasonable for the Appellate Court to rely on Braggs' testimony because Braggs was intoxicated, failed to provide police

with a physical description of the shooter, fled from the crime scene and failed to notify police about his observations until they tracked him down. Resp't Ex. A at 13-14. After reviewing the record and applying the correct federal standards, the Illinois Appellate Court found that (1) Petitioner failed to contradict Braggs' testimony that he was not intoxicated at the time of incident; (2) Braggs identified the Petitioner in a photo array, eliminating the need to provide the police a description; and (3) Braggs' failure to remain at the scene and provide the police with information because he was scared was consistent with human experience. *Id.*

"A witness's testimony is incredible as a matter of law if it is 'physically impossible for the witness to [have] observe[d] that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Bailey,* 510 F.3d 726, 733-34 (7th Cir. 2007) (citing *United States v. Hunter,* 145 F.3d 946, 949-50 (7th Cir. 1998) (quoting *United States v. Saulter,* 60 F.3d 270, 275 (7th Cir. 1995)). Petitioner comes nowhere near making that showing here, and "it is for the jury to evaluate the credibility of the witness[]." *Id.* (holding that drug-using "witnesses' shortcomings must be accounted for through cross-examination, not an exclusionary rule"). As with Jackson, the jury in Petitioner's trial assessed Braggs' testimony and found it credible. The Illinois Appellate Court reviewed the sufficiency and reliability of that evidence by applying the correct standards as set forth by the Supreme Court. Nothing in the state court's determination can be characterized as so unreasonable as to lie "well outside the boundaries of permissible differences of opinion.'" *McFowler,* 349 F.3d at 447 (citing *Williams,* 529 U.S. at 411); *see also Bailey*, 510 F.3d at 734 (7th Cir. 2007) ("Even if the witness testifies as to a period during which he was under the

influence of drugs, a jury is entitled to believe the witness and can discount the testimony as it sees fit" (citing *United States v. Blackman,* 950 F.2d 420, 424 (7th Cir. 1991) (jury entitled to believe a drug user); *United States v. Moore,* 425 F.3d 1061, 1073 (7th Cir. 2005) (jury entitled to credibility determination despite inconsistencies in witness's testimony); *United States v. Hodges,* 315 F.3d 794, 799 (7th Cir. 2003) ( "jury…is free to credit witnesses and resolve any inconsistencies in their testimony…and [the court] will not disturb their credibility findings" where petitioner argued that eyewitnesses' credibility was suspect because the witnesses had criminal pasts and gave conflicting statements to a grand jury); *United States v. Pagan,* 196 F.3d 884, 889 (7th Cir. 1999) (rational jury could have believed eyewitness's testimony despite allegations that he was a "drug dealer and user who was desperate for money when the government offered to pay him for his help" and that to the extent the eyewitness's "personal failings and motivations may have influenced his testimony was for the jury to decide"); *United States v. Woolfolk,* 197 F.3d 900, 904 (7th Cir. 1999) ("Questions of witness credibility are reserved for the jury, and its assessment will not be second guessed by [the court and, when]…a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, [the court] has no basis to interfere, as the jury is the final arbiter on such questions").

Under *Jackson*, juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Johnson*, -- U.S. --, --, 132 S.Ct. at 2064 (citing *Jackson*, 443 U.S. at 319). In this case, the jury considered the evidence and was convinced of Foy's guilt beyond a reasonable doubt. The Illinois Appellate Court found

the evidence sufficient and reliable after an objectively reasonable application of the correct federal standards to the facts of Foy's case, and specifically to the evaluation of the reliability of the testimony of Jackson and Braggs. Under the AEDPA, that determination is "entitled to considerable deference," *id.* at 2065, but here the result would be the same even if no deference was due. The petition provides no basis to question the Appellate Court's determination of the sufficiency of the evidence presented to sustain Petitioner's conviction and, accordingly, that claim is denied.

### B. Claim B: Independent Basis for Jackson's In-Court Identification

Petitioner's second claim challenges whether Jackson's in-court identification had an independent basis from the uncounseled lineup in which she participated. The petition and the reply do not clearly distinguish the import of this claim from Petitioner's claim that the identification testimony presented was unreliable, but reading Petitioner's submissions generously (as the Court should do; *see Ward v. Jenkins,* 613 F.3d 692, 697 (7th Cir. 2010) ("In determining whether a claim has been fairly presented, [the Court] liberally construe[s] pro se petitions"); *Lewis v. Sternes,* 390 F.3d 1019, 1027 (7th Cir. 2004) ("As [the petitioner] prepared the petition without the assistance of counsel, we owe it a generous interpretation")), Petitioner's pleadings appear to argue that Jackson's in-court identification benefitted from the impermissible lineup conducted before defense counsel was present. There are myriad defects in that argument.

The Court first notes that Claim B is defaulted on two procedural grounds. To preserve a claim for federal habeas review, a petitioner "must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review." *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010)

(citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45). "A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme court in a timely manner leads to a default of the claim, thus barring the federal court from reviewing the claim's merits." *McKee*, 598 F.3d at 382 (citing *O'Sullivan*, 526 U.S. at 848). "Fair presentment" to state courts requires the petitioner to assert his federal claims through "one complete round of state-court review, either on direct appeal" or in post-conviction proceedings. *Lewis*, 390 F.3d at 1025 (citing *O'Sullivan*, 526 U.S. at 845). Furthermore, a claim is procedurally defaulted if the state court rejects the claim "on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

Here, Petitioner failed to raise Claim B explicitly in his PLA to the Illinois Supreme Court. The PLA presented only the claim that Jackson's and Braggs' testimony was insufficient to sustain Petitioner's conviction, focusing on the same factors that are presented in Petitioner's Claim A in his present petition. Specifically, the PLA argued that the Appellate Court ignored certain factors regarding the eyewitnesses and their testimony. Resp't Ex. F at 12. The Petitioner also argued that the Appellate Court incorrectly applied the identification factors to Petitioner's case because it did not consider the uncounseled lineup in its decision and disregarded the lapse of "over two years" between the time of the incident and Jackson's description to the police. *Id.* at 13-14. Nowhere does the PLA make the claim that Jackson's in-court identification lacked an independent basis and has therefore procedurally defaulted the claim.

Moreover, on direct appeal, the Appellate Court rejected Claim B on an independent and adequate state law procedural ground. Specifically, because Petitioner failed to cite relevant authority and adequately argue the claim, the Appellate Court

"waived consideration of the issue under [Illinois] Supreme Court Rule 341(h)(7)."
Resp't Ex. A at 18; s*ee also Aliwoli v. Gilmore,* 127 F.3d 632, 634 (7th Cir. 1997) ("If a
claim is found to be waived by an Illinois appellate court, that constitutes an independent
and adequate state ground and [the Court] will not entertain that claim").  Accordingly,
the claim is procedurally defaulted on this basis as well.

A court may excuse procedural default if the petitioner can show either (1) "cause
for and prejudice stemming from that default" or (2) "that the denial of relief will result
in a miscarriage of justice." *Lewis*, 390 F.3d at 1026 (citing *Wainwright v. Sykes*, 433
U.S. 72, 86-87 (1977); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)).

"Cause for a default is ordinarily established by showing that some type of
external impediment prevented the petitioner from presenting his federal claim to the
state courts." *Id.* (citing *Murray*, 477 U.S. at 488)  "Prejudice is established by showing
that the violation of the petitioner's federal rights worked to his *actual* and substantial
disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.*
(emphasis in original) (internal quotations omitted) (citing *United States v. Frady*, 456
U.S. 152, 170 (1982)).

Alternatively, to show that the procedural bar would result in a miscarriage of
justice, "the petitioner must show that he is actually innocent of the offense for which he
was convicted, i.e., that no reasonable juror would have found him guilty of the crime but
for the error(s) he attributes to the state court." *Id.* (citing *Schulp v. Delo*, 513 U.S. 298,
327-29 (1995)).  That is a tall order.  "To demonstrate innocence so convincingly that no
reasonable jury could convict, a prisoner must have documentary, biological (DNA), or
other powerful evidence: perhaps some non-relative who placed him out of the city, with

credit card slips, photographs, and phone logs to back up the claim." *Schlup*, 513 U.S. at 324.

Petitioner has not established an exception to procedural default, either by showing "cause and prejudice" or the potential for the miscarriage of justice if habeas relief is procedurally barred. Petitioner asserts that he presented his final claims "in good faith because he relied upon an inadequate or incomplete record, and erroneous advice of his attorney." Pet'r's Reply at 23. Even if this were sufficient to establish the "cause" prong of the inquiry, Petitioner has failed to satisfy the showing of "prejudice" needed to excuse a procedural bar. *Lewis*, 390 F.3d at 1026. Lastly, Petitioner has made no attempt to show "powerful evidence" of actual innocence that would demonstrate the potential for a miscarriage of justice if relief is denied. *See Schlup*, 513 U.S. at 324.

Even if Claim B were reviewed on the merits, it would still fail. The Appellate Court correctly noted that, where lineup evidence has been suppressed, "a determination should be made as to whether the in-court identification has an independent source" apart from the lineup. Resp't Ex. A at 17 (citing *United States v. Wade*, 388 U.S. 218, 242 (1967)). Specifically, to "allow a witness to make an in-court identification after an uncounseled lineup identification…the government must show by clear and convincing evidence that there is an independent basis for" that in-court identification. *United States v. West,* 628 F.3d 425, 428 (7th Cir. 2010) (citing *Wade,* 388 U.S. at 240-41). When deciding whether an independent basis exists, the Supreme Court has explained that various factors should be considered, including:

> [1] the [witness's] prior opportunity to observe the alleged criminal act, [2] the existence of any discrepancy between any pre-lineup description and the defendant's actual description, [3] any identification prior to lineup of another person, [4] the identification by picture of the defendant prior to

the lineup, [5] failure to identify the defendant on a prior occasion, and [6] the lapse of time between the alleged act and the lineup identification.

*Wade,* 388 U.S. at 241.

In rejecting Petitioner's claim, the Appellate Court noted that the trial court held an independent-basis hearing,[12] but did not explicitly state whether that hearing had satisfied *Wade*. However, the deferential standard of § 2254(d) applies "even where there has been a summary denial" of a petitioner's claim. *Cullen v. Pinholster,* -- U.S. --, --, 131 S.Ct. 1388, 1402 (2011) (internal quotations and citations omitted). Under these circumstances, Foy's claim could only succeed if he showed there was "no reasonable basis" for the Appellate Court's decision. *Id.* (internal quotations and citations omitted). For the habeas court's part, it "must determine what arguments or theories…could have supporte[d] the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court] *Id.* (internal quotations and citations omitted). Based on the record before the state court, Foy's claim would fail on the merits.

The Seventh Circuit has "has found the existence of a sufficient alternative foundation for in-court identification even where a small number of [*Wade*] factors are present." *United States v. Anderson,* 714 F.2d 684, 686 (7th Cir. 1983) (citing *United*

---

[12] The trial court conducted a suppression and independent-basis hearing regarding Jackson's lineup and in-court testimony. The trial court suppressed the lineup evidence because Petitioner was denied his right to have counsel present during that lineup. Resp't Ex. A at 11. The trial court denied, however, Petitioner's claim that Jackson's in-court testimony should be inadmissible because it did not have an independent basis from the allegedly suggestive lineup. Resp't Ex. S at VV-38. The court made no determination on whether the lineup was suggestive, *id.* at VV-38, but concluded only that, whether or not the lineup was suggestive, Jackson's observations during the commission of the crime had an independent basis and could be presented at trial. *Id.*

*States ex rel. Harris v. State of Illinois*, 457 F.2d 191, 194 (7th Cir.1972) (*Wade* test satisfied where witness observed defendant at scene for one minute and never identified another as perpetrator)).  Here, there is ample evidence in the record to find that Jackson's testimony was "based upon observations of the suspect other than the lineup identification." *Wade*, 388 U.S. at 240.

The Appellate Court's Claim A findings under *Biggers* apply equally to a *Wade* analysis: (1) Jackson had an opportunity to observe the criminal act—she witnessed the shooter in daylight, both on foot and shooting from a vehicle; (2) the description of the shooter Jackson provided to police was similar to the Petitioner's actual description, which included the notable characteristic of a teardrop tattoo on his face; (3) Jackson never identified another person prior to the lineup; (4) Jackson was not shown photos of Petitioner at any time prior to the in-court identification; and (5) Jackson never failed to identify the Petitioner prior to the in-court identification.  Finally, and as previously discussed, the lapse of more than two years between the crime and the first description Jackson provided to the police, while substantial, does not render the identification unreliable in the context of the substantial and multiple opportunities that Jackson had to observe the shooter during the commission of the crime.

This record more than supports an independent basis for Jackson's in-court identification.  Accordingly, reviewed on the merits, Petitioner's second claim would fail. However, because Petitioner did not include Claim B in his PLA and the Appellate Court barred Claim B on an independent and adequate state procedural ground, Petitioner's second claim is procedurally defaulted, and therefore denied on that ground.

### C. Claim C: Admission of Hearsay Testimony

As Petitioner acknowledges, Claim C is procedurally defaulted because he failed to raise the issue in his PLA to the Illinois Supreme Court. Pet'r's Reply at 23. Petitioner has not established an exception to procedural default, either by showing "cause and prejudice" or the potential for the miscarriage of justice if habeas relief is procedurally barred.

Accordingly, Claim C is procedurally defaulted and is denied on that basis.

### III.     Certificate of Appealability

When denying a petition for a writ of habeas corpus, this Court must decide whether to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings for the United States District Courts. To be entitled to a certificate of appealability, Petitioner must make "a substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (citing 28 U.S.C. § 2253(c)(2)). This requirement includes "showing that reasonable jurists could debate whether…the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* at 484 (internal citations omitted). The Court does not find Petitioner's arguments to present any significant basis to support the grant of his petition and therefore concludes that Petitioner has failed to make the required showing. Therefore, a certificate of appealability is denied.

### IV.     CONCLUSION

Because the Illinois Appellate Court reasonably determined the evidence was sufficient to prove Petitioner's guilt beyond a reasonable doubt, and Petitioner's

remaining claims are procedurally defaulted, Foy's petition for a writ for habeas corpus is denied. Because Petitioner failed to make a substantial showing of the denial of a constitutional right, debatable by reasonable jurists, the Court declines to issue a certificate of appealability.

Date: July 17, 2012

_____
John J. Tharp, Jr.
District Judge